# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

GWENDOLYN WHITLEY,

            Plaintiff,

v.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 13-1335 (MJD/LIB)

STANDARD INSURANCE CO. and
LAKE REGION MEDICAL GROUP, P.A.,

            Defendant.

Sean T. Foss, Kennelly & O'Keeffe, Ltd., Counsel for Plaintiff.

Molly R. Hamilton and Terrance J. Wagener, Messerli & Kramer P.A., Counsel for Defendant Standard Insurance Co.

Kent D. Mattson and Samuel S. Rufer, Pemberton Law, Counsel for Defendant Lake Region Medical Group, P.A.

## I.      INTRODUCTION

      This matter is before the Court on Defendant Standard Insurance

Company's Motion for Summary Judgment [Docket No. 30], Defendant Lake

Region Medical Group, P.A.'s Motion for Summary Judgment [Docket No. 42],

and Plaintiff Gwendolyn Whitley's Motion for Summary Judgment [Docket No.

47].  Oral argument took place on Friday, November 7, 2014.  For the reasons set

forth below, the Court grants Lake Region Medical Group, P.A.'s motion and

dismisses Count II of the Amended Complaint, denies Defendant Standard

Insurance Company's motion, and grants Plaintiff Whitley's motion as to Count I

of the Amended Complaint.

## II.      BACKGROUND

### A.      Factual Background

#### 1.      Plaintiff's Employment and Disability Insurance Coverage

Plaintiff Gwendolyn Whitley was employed at Defendant Lake Region

Medical Group, P.A. ("Lake Region") as an emergency room physician.  (STND[1]

993, 1052.)  She is Board Certified in family medicine and previously practiced

family medicine.  (Id.  995, 1020.)

Whitley's employment contract with Lake Region, dated October 20, 2008,

stated that she was hired "as a physician practicing in the specialty of Emergency

Department Medicine."  (Id. 1175.)  Whitley's employment contract also

---

[1] The administrative record compiled by Standard in its administration of the Plaintiff's claim for long-term disability was filed conventionally as Exhibit A to the Affidavit of Dawn E. Schonberg in Support of Standard's Motion for Summary Judgment [Docket No. 33].  The pages were numbered STND13-01765-00001 through STND 13-01765-01185.  Citations to the administrative record will be provided by the last digits.

provided: "Physician shall be afforded disability insurance benefits pursuant to the Corporation's plans and policies maintained by the Corporation, in accordance with the eligibility provisions and other terms and conditions thereof." (Id. 1178.)

According to Whitley, when she decided to work for Lake Region, she asked about Lake Region's disability insurance plan for physicians. (Affidavit of Sean T. Foss ("Foss Aff."), Ex. A, Deposition of Gwendolyn Whitley ("Whitley Dep.") 90-91 [Docket No. 54].) She specifically asked John Peterson, Lake Region's chief executive officer, whether the disability insurance policy was an "own occupation" policy and would provide coverage to her if she were unable to work as an emergency medicine physician. (Id.; Foss Aff., Ex. B, Deposition of John Peterson ("Peterson Dep.") 6-7.) Whitley already had an existing disability insurance policy that provided own occupation coverage to her as an emergency medicine physician, and she did not want to drop that coverage until she was sure that her new insurance through Lake Region would cover her own occupation. (Whitley Dep. 90-91.) However, Lake Region did not take any steps to ensure that the policy provided own occupation coverage to Whitley as an emergency medicine physician. (Peterson Dep. 35.)

In 2010, after Whitley received a memorandum from Lake Region discussing changes to disability coverage under her policy, she then contacted Lake Region's Human Resources Director, Mardelle Jacobson, and her supervisor to ask whether the changes affected her coverage.  (Peterson Dep. 59; Foss Aff., Ex. C, Deposition of Mardelle Jacobson ("Jacobson Dep.") 6; Whitley Dep. 58-59, 96-97.)  She was particularly concerned about whether her own occupation would be an emergency room physician, because she was board certified in family medicine.  (Whitley Dep. 96-97.)  They both told her that her own occupation would be emergency room physician.  (Id. 58-59, 96-97.)  Whitley testified that no one at Lake Region ever indicated that she needed to direct her question to the insurer.  (Id. 96.)

## 2.   Applicable Disability Policy

On May 1, 2004, Defendant Standard Insurance Company ("Standard") issued Group Policy No. 642850 (the "Policy" or "Plan") to Lake Region.  (STND 2, 14.)  The Policy provides, in relevant part, that an employee is "Disabled" if she meets the Policy's "Own Occupation Definition Of Disability," defined as:

A. Own Occupation Definition Of Disability

. . .

4

You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity one of the Material Duties of your Own Occupation.

Note: You are not Disabled merely because your right to perform your Own Occupation is restricted, including a restriction or loss of license.

During the Own Occupation Period you may work in another occupation while you meet the Own Occupation Definition Of Disability.  However, you will no longer be Disabled when your Work Earnings from another occupation meet or exceed 80% of your Indexed Predisability Earnings.  Your Work Earnings may be Deductible Income.  See **Return To Work Provisions** and **Deductible Income**.

Own Occupation means any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for your Employer when Disability begins.  In determining your Own Occupation, we are not limited to looking at the way you perform your job for your Employer, but we may also look at the way the occupation is generally performed in the national economy.  If your Own Occupation involves the rendering of professional services and you are required to have a professional or occupational license in order to work, your Own Occupation is as broad as the scope of your license.

However, if your Own Occupation is medical doctor, during the Benefit Waiting Period and the Own Occupation Period, we will consider your Own Occupation to be the one general or sub-specialty in which you are board certified to practice for which there is a specialty or subspecialty recognized by the American Board of Medical Specialties, provided you have earned at least 60% of your gross professional service fee income in your specialty or sub-

specialty during the 24 months immediately before you become Disabled.  If the sub-specialty in which you are practicing is not recognized by the American Board of Medical Specialties, you will be considered practicing in the general specialty category.

Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted.  In no event will we consider working an average of more than 40 hours per week to be a Material Duty.

(Id. 6-7.)

The Policy further provides:

A. Return To Work Responsibility.

During the Own Occupation Period no LTD Benefits will be paid for any period when you are able to work in your Own Occupation and able to earn at least 20% of your Indexed Predisability Earnings, but you elect not to work.

(Id. 24.)

Also:

C. Proof Of Loss.

Proof Of Loss means written proof that you are Disabled and entitled to LTD Benefits.  Proof Of Loss must be provided at your expense.

For claims of Disability due to conditions other than Mental Disorders, we may require proof of physical impairment that results from anatomical or physiological abnormalities which are

6

demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

(Id. 35.)

The Policy also addresses Standard's authority to make benefits decisions:

Except for those functions which the Group Policy specifically reserves to the Policyholder or Employer, we have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy.

Our authority includes, but is not limited to:

1. The right to resolve all matters when a review has been requested;

2. The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;

3. The right to determine:

   a. Eligibility for insurance;

   b. Entitlement to benefits;

   c. The amount of benefits payable; and

   d. The sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.

Subject to the review procedures of the Group Policy, any decision we make in the exercise of our authority is conclusive and binding.

(Id. 37.)

### 3.    Plaintiff's Injury and Claim for Long-Term Disability Benefits

On February 20, 2011, Whitley was injured in a motor vehicle accident. (STND 93, 306.)  A few weeks after the accident, Whitley attempted to return to work full-time at Lake Region.  (Id. 736, 804-05.)  She was unable to continue her schedule, however, because of fatigue, short-term memory loss, and an inability to properly perform the duties of an emergency room physician.  (Id.)

On June 28, 2011, Whitley made a claim for long-term disability benefits under the Policy.  (Id. 993-95.)  In her claim, she noted that she was unable to perform her occupation due to post-concussive syndrome, a C5 disk rupture, headaches, back pain, and memory problems.  (Id. 993.)  She had attempted to return to work as an emergency room physician at Lake Region from March 16, 2011, through March 24, 2011, but that attempt was unsuccessful.  (Id.)

Along with her claim, Whitley submitted an Attending Physician Statement from her primary care physician, Patricia Lindholm, M.D., who diagnosed Whitley with "cerebral concussion and postconcussive syndrome." (Id. 809.)  Lindholm referred to an April 7, 2011, neuropsychological evaluation performed by Paula Bergloff, Ph.D., which concluded that Whitley was suffering from a "mild traumatic brain injury with persistent postconcussion symptoms."

8

(<u>Id.</u> 738.)  Bergloff noted that Whitley had problems with headaches, which became more intense from thinking, needed to sleep for long periods of time, and was unable to remember patients during her attempted return to work.  (<u>Id.</u> 736.)  Referencing this report, Lindholm recommended that Whitley stop working because of her failed attempt and not return until cleared to do so by Bergloff.  (<u>Id.</u> 810)  Dr. James Andrews, D.O., also concluded that Whitley should not be working because her postconcussive syndrome was "significantly affecting her memory and she has had this well documented through neuropsychology and speech pathology."  (<u>Id.</u> 798.)

In August 2011, Whitley submitted Attending Physician Statements from Bergloff and Tanya Harlow, M.D.  Bergloff's statement provided a primary diagnosis of "post concussive syndrome" and a secondary diagnosis of "neck pain, headaches" and recommended that Whitley should not work due to "cognitive an[d] physical symptoms."  (<u>Id.</u> 298-299.)  She opined that, when Whitley was able to return to work, she would "need reduction in work hours." (<u>Id.</u>)  Harlow identified Whitley's primary diagnosis as postconcussive syndrome with a secondary diagnosis of neck pain and noted that Whitley was unable to work due to "cognitive difficulties."  (<u>Id.</u> 707.)  Harlow opined that

Whitley was "gradually improving," might be ready for a trial return to work in one to two months, and her condition was expected to improve in the next three to six months.  (Id. 708.)

### 4.    Lake Region's Failure to Provide Whitley's Occupational Information to Standard

In July 2011 and again in August 2011, Standard requested that Lake Region provide "[a] monthly breakdown of Dr. Whitley's CPT [current procedural terminology] codes (monthly charges and units for each activity code) for the period January 1, 2009 through the present" to assist Standard "in further clarifying Dr. Whitley's specialty as specified under the group policy (i.e. Definition of Own Occupation)."  (STND 957.)

On August 30, 2011, Jacobson sent a fax to Standard in response to its request for information.  (Id. 1168-85.)  The cover letter stated, in part: "[e]nclosed are the documents you requested: . . . 4. Monthly breakdown of CPT codes . . . ."  (Id. 1169.)  However, the materials did not include any CPT codes at all.  (Peterson Dep. 57.)  Jacobson had simply forwarded to Standard what the third-party administrator had provided to her and did not even know what CPT codes were.  (Jacobson Dep. 30-34, 49-50.)

Whitley did not have access to CPT codes during this time period and could not have provided them to Standard herself.  (Jacobson Dep. 40; Peterson Dep. 42; Whitley Dep. 98.)  Jacobson was responsible for providing information from Lake Region to Standard and helping Lake Region's employees file claims for coverage.  (Peterson Dep. 26, 28.)  If Lake Region had provided the CPT codes, they would have shown that Whitley worked exclusively as an emergency medicine physician during the 24 months preceding her injury.  (Peterson Dep. 58.)

### 5.     Standard's Approval of Whitley's Disability Claim

In September 2011, Elaine Greif, Ph.D., a psychology consultant, reviewed Whitley's claim for Standard.  (STND 677-681.)  Greif concluded that Whitley's "[s]ignificant impairing condition" was related to "postconcussive syndrome with cognitive inefficiencies."  (Id. 679.)  Greif opined that there was support for Whitley's inability to work since her injury due to postconcussive syndrome and resulting cognitive impairments, but that, in three to six months, the symptoms should moderate and allow Whitley to return to work.  (Id.)  Greif recommended that the lifting of restrictions be determined based on future neuropsychological re-evaluations.  (Id. 680-81.)

On September 27, 2011, Standard informed Whitley that it had approved her claim for long-term disability benefits.  (STND 938.)  It paid her retroactive benefits and began paying monthly benefits.  (Id.)  Standard also stated that it would monitor her continued eligibility for long-term disability benefits by periodically providing Whitley with Attending Physician Statements and Authorization forms for release of medical records.  (Id. 940.)

### 6.   Standard's Vocational Assessments

On December 1, 2011, Standard referred Whitley's claim to Vocational Case Manager Jan Cottrell for comment on Whitley's "Own Occupation." (STND 1037.)  Cottrell opined that, because Whitley is licensed as a physician and surgeon and her board certified specialty was family medicine, Whitley's own occupation "would be most reasonably represented by family medicine physician."  (Id. 1039.)  Under the Dictionary of Occupational Title ("DOT"), a family practitioner is considered "light" work.  (Id.)  Cottrell classified Whitley's own occupation as family medicine although she noted that Whitley was listed in Lake Region's directory of physicians under "Emergency Medicine" and that "procedure codes and professional service fee income information were not present in the claimant's file at the time of this review."  (Id. 1037-38.)

On October 3, 2012, Karol Paquette, MS, CRC, vocational case manager, provided a Vocational Assessment to Standard.  (Id. 1022-1034.)  Paquette noted that Whitley had "worked for many years as an emergency room physician" but that she was board certified as a family practitioner.  (Id. 1024.)  Paquette decided not to use emergency room physician as Whitley's own occupation "because the DOT does not have a specific definition for an emergency room physician," and "these physicians are best described within the scope of General Practitioner." (Id. 1025.)  She also decided that the mental demands of Family Practitioner and General Practitioner are essentially the same and both meet the physical demand for "light level work."  (Id. 1025-26.)

Paquette did allow that the temperament requirements related to the occupation of emergency room physician "would be more functionally challenging given the pace and urgency of ER medicine."  (Id. 1029.)  She noted that emergency room physicians "may work long shifts, on-call and the like due to the need for emergency departments to have coverage on a 24/7 basis."  (Id. 1025.)  Also, emergency room physicians:

> may have to work at a more intensive pace [than family practitioners] requiring physical and mental endurance for handling emergencies of various kinds which can include accidents or multiple accidents involving prolonged or back to back patient

stabilization, surgical procedures and diagnosing and testing.  These duties, especially the surgeries can involve greater physical exertion than that generally required of a general physician . . . .

(Id. 1025.)  She further remarked:

It would be reasonable to expect that the stress involved in emergency work is going to be greater than that found in an office or clinical setting where family practitioners generally work. Generally, the levels of life threatening illnesses and injuries are going to be of greater magnitude for an ER physician that for a family practice physician in a clinic setting.

(Id. 1028-29.)

### 7.    Whitley's Request to Gradually Return to Work

On August 30, 2011, Whitley told Harlow that "most of her symptoms are improving" and "her brain is much better."  (STND 321.)  Whitley stated that "she is ready to go back to work in the next month."  (Id. 324.)  However, Harlow reported that Whitley "does continue to report significant difficulties with neck pain, which she feels is worsening," and "does report that the pain has been escalating in the last several weeks."  (Id. 322.)  MRIs of Whitley's thoracic and cervical spine showed no significant abnormalities.  (Id. 334-336.)  In September 2011, Andrews wrote that Whitley "is making excellent gains from a postconcussive standpoint.  She would like to return to work at some point and I would leave this to her neuropsychologist to assist with this."  (Id. 344.)

14

In October 2011, Bergloff noted that Whitley was improving, but that symptoms developed when Whitley over-exerted herself.  (<u>Id.</u> 636.)  Bergloff indicated that Whitley understood that she needed to initially return to work on a limited basis and then gradually increase her work hours as was tolerable.  (<u>Id.</u>)

In January 2012, Whitley told Lindholm that she was "doing well" and "is currently asymptomatic."  (<u>Id.</u> 347.)   Lindholm noted that Whitley's neurologist and neuropsychologist "feel that she may return to work, starting with 4 hour shifts."  (<u>Id.</u>)  Also in January, Whitley again saw Bergloff, who concluded that Whitley was doing "fairly well" physically and recommended a part-time return to work.  (<u>Id.</u> 596.)

On February 2, 2012, Whitley sent a letter to Lake Region stating that she was ready to return to work to "perform the full scope of emergency medicine duties."  (<u>Id.</u> 618-19.)  She wrote that her "medical team has approved my return to work in the Emergency Department" and "have repetitively assured me that my intelligence and fund of knowledge are unchanged and undamaged."  (<u>Id.</u> 618-619.)  Whitley requested that Lake Region allow her to "return to work for two 4 hours shifts a week with double coverage for the first weeks."  (<u>Id.</u> 619.)

Lake Region responded that it could not accommodate that request, but that it was open to alternative work possibilities.  (Id. 923.)

On March 30, 2012, Bergloff performed a neuropsychological reevaluation of Whitley's postconcussion symptoms.  (STND 585-593.)  The diagnosis was still mild traumatic brain injury and persistent postconcussion symptoms, although the symptoms had improved.  (Id. 588.)  Bergloff wrote:

> The above evaluation findings reflect the presence of no cognitive impairments in any area.  Relative to the previous evaluation, she has shown improvement in previous areas of weakness.

(Id. 587-588.)  Bergloff concluded that Whitley could start a return to work trial.

(Id. 588.)  As part of the return-to-work trial, Bergloff recommended that Whitley be supervised and begin working on a part-time basis with her hours gradually increasing.  (Id.)  Bergloff stated that Whitley's treatment was supported by Nan Kennelly, a speech pathologist.  (Id. 586.)

In an April 2012 follow-up with Lindholm, Whitley stated that she was "feeling back to normal" and that she no longer experienced headaches, could sustain attention very well, and was able to enjoy reading again.  (Id. 356.) Lindholm reported that Whitley "has done maintenance of certification and

other CME activities (80 hours).  Is very eager to get back to work and have some

purpose in her life."  (Id.)

On June 12, 2012, Whitley provided Standard with an updated Attending

Physician's Statement from Lindholm.  (Id. 630.)  Lindholm observed Whitley's

"[i]mproved" condition" and opined that "[n]o further treatment is planned."

(Id.)  Lindholm concluded that Whitley "[n]eed[ed] a transitional return to work

starting with 4 hours/day limitation."  (Id.)

### 8.    Standard's Discontinuation of Benefits

Standard provided Whitley's medical records to consulting physician

Bradley Fancher, M.D., a specialist in internal medicine.  (STND 577.)  In a July

27, 2012, memorandum, Fancher opined that the records showed that "the

claimant is recovered and has no cognitive impairments which would preclude

her from performing the usual duties as a physician."  (Id. 577.)  For this

conclusion, Fancher cited to Bergloff's March 30, 2012 report.  (Id.)  Fancher

wrote, "While I certainly understand the rationale [behind Bergloff's suggestion

of a gradual return to work], I do not believe this is an imperative requirement

and given the nature of the claimant's work, I do not see any necessity for a work

hardening program."  (Id.)

After receiving Fancher's recommendation, Standard discontinued

Whitley's long-term disability benefits effective July 31, 2012.  (Id. 911.)  In its

August 5, 2012, decision, Standard determined that Whitley's "Own Occupation"

was that of a "family medicine practitioner."  (Id. 912-13.)  It explained:

> [Y]our Own Occupation is considered as broad as the scope of your
> license, unless we are provided documentation that at least 60% of
> your gross professional service fee income is earned in your
> specialty or sub-specialty during the 24 months prior to Disability.
> Since your employer was not able to provide a record of your
> professional service codes, your specialty per the American Board of
> Medicinal Specialties is family medicine physician, and you worked
> in an alternative emergency medicine setting, your Own Occupation
> is recognized as broad as the scope of your medical license.

(Id.)  It further noted:

> [Y]our Own Occupation under the group policy is not limited to
> work at Lake Region Medical, a particular schedule you had at Lake
> Region Medical, or a preference you may have in respect to work
> duties.  Your Own Occupation is not considered an emergency
> medicine physician, and what may be considered normal work
> arrangements for medical practices, facilities, or hospitals that
> provide emergency medicine.  Your Own Occupation, as specified
> under your Group Policy, encompasses any and all reasonable
> manners in which your own occupation as defined above can be
> performed in the national economy.  It is only if your limitations and
> restrictions preclude you from performing with reasonable
> continuity the Material Duties of your Own Occupation as defined
> that you may remain eligible for continued benefits under the group
> policy.

> Based on our review of the available medical records, statements from your medical providers and employer, and medical and vocational assessments, we do not find substantiation that you are presently precluded from performing with reasonable continuity the Material Duties of your Own Occupation as that occupation is defined under the group policy.  Accordingly, we have determined that your LTD claim should be closed effective July 31, 2012.

(Id. 915.)

### 9.    Whitley's Appeal

On August 23, 2012, Whitley appealed Standard's termination decision. (STND 543.)  In her appeal, she stated: "I am improved; I am happy to be better. I do want to return to full time work as an emergency medicine physician.  I am not ready to return to work full time yet, however."  (Id.)

In support of the appeal, Whitley submitted letters to Standard from Bergloff, Lindholm, and Kennelly opining that she should gradually return to work.  In the September 13, 2012 support letter from Bergloff, Bergloff noted that a "lack of impairments found in a cognitive profile [] does not mean that a patient is ready to resume competitive full time employment" and that

> [l]ack of impairment in testing does not always equate with success in a real-world environment, especially when there is an interaction between multiple symptoms.  It is important to keep in mind, that cognitive performance can be stronger when assessed in isolation in a nondistracting (office) environment.

(Id. 524.)  Bergloff further explained that:

19

> [Whitley] experiences significant problems with increased physical symptoms, physical and mental fatigue when she engages in activity for sustained periods of time.  Her physical therapist has found that over activity results in increased pain symptoms.  Her primary care physician, Dr. Lindholm, also supports a gradual return to work plan.

(Id.)

Lindholm noted that Whitley "cannot be expected to immediately return to a full work schedule and is therefore not able to support herself by working in her profession."  (Id. 545.)   Lindholm opined that "[s]he is still quite physically fatigued at the end of a day and needs to be allowed to gradually increase her hours and responsibilities in order to ensure that she can succeed in resuming part time work."  (Id. 545.)

Finally, speech-language pathologist Kennelly stated that Whitley was motivated to return to work, but that her performance on cognitive tests did not predict her ability to perform her duties as an emergency medicine physician. (Id. 539-40.)  She noted that "the very nature of executive function disorder includes difficulty executing with distraction, time pressure, interruptions and multi-tasking," and that Whitley's improvement in her executive functions "endorses the presence of the traumatic brain injury."  (Id. 539-540.)  She opined that, in order to succeed at work, Whitley needed to test her executive functions

in the workplace and the standard method to do so would be to return to work

on a trial basis.  (Id. 540.)

### a)      Consulting Medical Providers' Opinions

Standard submitted Whitley's medical records to Thomas Morgan, M.D.,

Board Certified Neurologist and Independent Medical Examiner.  (STND 457-

465.)  Morgan opined that Whitley had no "restrictions or limitations with

respect to her work as a family practice physician in an emergency room setting"

and "would be able to perform either work in a family practice setting or in an

emergency room setting . . . based on the nature of her mild concussion post-

concussion syndrome and the normalization of her neuropsychological testing."

(Id. 463-64.)  He also concluded:

> Dr. Whitley can return to work on a full time basis as of 07/31/12 and
> beyond.  This opinion is based on her initial diagnosis of mild
> concussion post-concussion syndrome with resolution of any
> cognitive deficits as noted by the neuropsychological examination
> on 03/13/12.  Her neurological examinations have been normal, both
> cognitively and behaviorally and in my opinion would not require
> limitations or restrictions.

(Id. 464.)

Standard also obtained a neuropsychological opinion from Mark Williams,

Ph.D.  (Id. 419-450.)  Williams opined that Whitley was able to work on a full-

time basis with reasonably continuity as of July 31, 2012.  (Id. 445.)    Williams

provided the following reasoning:

> I do not believe that the evidence supports the presence of cognitive deficits at this time.  The claimant suffered a mild traumatic brain injury.  Outcomes research strongly supports the expectation of a full recovery in cognitive functions.  The claimant's test scores are consistent with a return to normal cognitive functions.  It is highly likely that the claimant's cognitive skills as it relates to her ability to practice both emergency medicine and family medicine are not meaningfully different at present compared to prior to her 2/2011 injury.  Dr. Bergloff's opinion as the claimant's treating neuropsychologist is also that she has no objective cognitive impairments.  The record also reflects subjective reports from the claimant that she felt cognitively able to return to work . . . .

> I have reviewed the vocational consultant's report including the information about the specific aptitudes required of persons working as family practitioners and general practitioners as well as the consultant's comments on the unique demands of emergency room practice.  I do not believe, from a cognitive or psychological perspective that the claimant would be unable to meet these performance standards.

(Id. 442-443.)  Williams also concluded that a return to work on a reduced

schedule, as recommended by Bergloff, was not necessary:

> While I understand Dr. Bergloff's thinking, and I respect her desire to be cautious, based on my consideration of the full set of information that has been provided to me, it is my opinion that Dr. Bergloff's recommendations are overly restrictive.  Specifically, I do not find any objective or even compelling subjective support for the suggestion that the claimant may continue to have significant problems with "mental endurance."  At this point in time it would

not be an expected consequence of a mild traumatic brain injury that occurred 21 months ago.  Also, Dr. Bergloff reported to me observing no signs of fatigue or a decline in functioning during the claimant's day long neuropsychological examination.  Also, between 5/2011 and 2/2012 she reportedly completed 80 hours of CMEs.  On 3/19/12 the claimant reported to Dr. Bergloff that she loves to read again and is able to read for 4-5 hours at a time.  These are specific examples of what appear to me to reflect intact levels of "mental endurance."

(Id. 443.)

Greif reviewed Whitley's claim file on September 6, 2012.  (Id. 529.)  Greif stated that it was unknown whether Whitley was back to her "baseline function from before the concussion."  (Id. 530.)  Greif emphasized that Whitley had a history of concussions and that "given the nature of high responsibility of a physician in her occupation, working in the emergency room, it would be prudent to have a return-to-work plan that involves monitoring adequacy of her work."  (Id.)  However,

[i]n terms of a gradual return to work, I would say that while this might be ideal, it is not necessarily supported in documentation that the patient could not physically manage a full day.  Again, gradual return would be ideal, not necessarily protracted, like half time or three quarters raising to full time within 2 to 3 weeks.  If this is not doable from her employer, I think it is reasonable for her to try a full-time return.

(Id.)

### b)    Additional Medical Records Submitted with Appeal

Standard also obtained additional updated medical records during the

appeal process.  In November 2012, Whitley underwent a left knee arthroscopy.

(STND 390.)  In December 2012, she underwent a right total knee arthroplasty.

(Id. 400.)  In November 2012 and January 2013, she reported chronic pain,

fatigue, ataxia, balance problems, and blurred vision.  (Id. 404, 392.)

On January 16, 2013, Lindholm sent a letter to Standard opining that

Whitley is permanently disabled as a result of "pre-existing spine and joint

disease and the traumatic brain injury sustained in March 2011.  She will

continue to have chronic pain into the future and some residual neurologic

symptoms from the brain injury."  (STND 414.)  Lindholm asserted that Whitley

"will not likely to be able to perform as a physician in any capacity in the future."

(Id. 414.)

On January 26, 2013, Whitley sent a letter to Standard stating that she

suffered chronic pain and visually based loss of balance.  (STND 296.)

### c)    Additional Consulting Reports

Based on the additional medical records, Standard requested that Morgan

provide a supplemental report, and also asked for an independent medical

review from orthopedic surgeon, H. Donald Lambe, M.D.

Morgan's February 19, 2013, Addendum Report affirmed his original opinion that Whitley was able to return to work as of July 31, 2012.  (STND 234-242.)  Morgan opined that her claims of ataxia, imbalance, and blurred vision were inconsistent with the medical records; Whitley's post-operative examinations revealed no ataxia and Lindholm reported that Whitley's gait was normal on January 16, 2013.  (Id. 240.)  Morgan also disagreed with Lindholm's January 16, 2013 letter indicating that Whitley was permanently disabled:

> I respectfully disagree with Dr. Lindholm's letter of 01/16/13. Dr. Whitley does relate chronic pain complaints that are accounted for by her knee arthritis, degenerative disc disease of her neck and back.  These chronic pain complaints would not limit or restrict her ability to work as a Family Practice Physician in an Emergency Room setting.  Her pain complaints are one of tolerance which is subjective and not measurable and would not qualify as an impairment that would restrict or limit her ability to work as a Family Practice Physician in an Emergency Room Setting.  It is understandable that Dr. Lindholm wants to advocate for her patient Dr. Whitley based on pain tolerance but this does not restrict or limit her ability to work based on AMA guides 6th edition or the AMA guides to evaluation of work ability and return to work 2nd edition. I respectfully disagree with Dr. Lindholm that Dr. Whitley has any residuals of her concussion post-concussion syndrome or chronic traumatic encephalopathy.  Dr. Whitley had a minor concussion at best, these conditions heal within days to weeks and are not sufficient to cause chronic traumatic encephalopathy.  This condition was excluded based on a normal MRI scan, normal neurological and neuropsychological examinations.

(Id. 240.)

25

Lambe's report, dated February 8, 2013, opined that Whitley was able to

return to work on a full-time basis from July 31, 2012 until the time of her knee

surgeries in October and December 2012, and then could return to work full time

after the surgeries by March 11, 2013.  (Id. 221-23.)  Lambe did not agree with

Lindholm that Whitley is permanently disabled: ". . . the patient's treating

neuropsychologist has opined that she is able to work as a physician.  . . . her

bilateral hip and knee conditions do not preclude the standing and walking

required of an ER physician, nor does her degenerative disc disease preclude the

other light physical demands of that profession."  (Id. 222.)

### d)    Whitley's Request for Information from Lake Region

In August 2012, Whitley contacted Lake Region to ask Lake Region to

provide a copy of CPT service codes for the 24 months before February 2011 to

her lawyer.  (Foss Aff., Ex. D.)  On September 12, 2012, Lake Region sent a letter

to Whitley enclosing the letter that it had purportedly sent to Standard on

September 10, 2012, which stated:

> In connection with Dr. Gwen Whitley's claim for disability benefits
> from Standard Insurance Company, this correspondence will verify
> that in the 24 month period prior to February, 2011, Dr. Whitley
> provided professional services through her employment with Lake
> Region Medical Group, PA solely as an emergency medicine
> specialist.   During  that  period,  Dr.  Whitley  did  not  provide

professional services on behalf of Lake Region Medical Group PA in any other specialty or service.

(Foss Aff., Ex. E.)  Lake Region did not enclose Whitley's actual CPT service codes with its September 2012 letter to Standard.

### 10.    Standard's Decision on Appeal

On March 28, 2013, Standard affirmed its decision to discontinue benefits. (STND 825-46.)

### B.    Procedural History

In May 2013, Whitley commenced a lawsuit against Standard and Lake Region in Minnesota state court, Otter Tail County.  On June 4, 2013, Standard removed the case to this Court based on federal question jurisdiction.

On February 14, 2014, the Court allowed Whitley to file an Amended Complaint against the same Defendants.  The Amended Complaint alleges: Count 1: Claim for Benefits under 29 U.S.C. § 1132(a)(1)(B) (against Standard); and Count 2: Claim for Breaches of Fiduciary Duty under 29 U.S.C. § 1132(a)(3)(B) (against Lake Region).  Standard, Lake Region, and Whitley now each move for summary judgment.  Standard joins in Lake Region's motion for summary judgment.

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### B.    Whitley's Claim Against Standard

Whitley and Standard have filed cross-motions for summary judgment on

Count I of the Amended Complaint, Claim for Benefits under 29 U.S.C.

§ 1132(a)(1)(B) against Standard.  Whitley claims that Standard abused its

discretion in determining that Whitley's "Own Occupation" is a family medicine

physician rather than emergency physician, and that she was not disabled under

the Policy terms.  Standard asserts that its decision to discontinue benefits was

supported by the administrative record, and that even if Whitley's "Own

Occupation" was emergency room physician, it considered her claims under that

occupation.  For the reasons set forth below, the Court finds that Standard

abused its discretion in concluding that Whitley's "Own Occupation" is family

medicine physician and that Whitley was not disabled under the Policy.

Accordingly, it grants Whitley's motion for summary judgment as to Count I.

### 1.    Applicable Standard of Review

A "denial of benefits challenged under [ERISA] is to be reviewed under a

de novo standard unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits."  Firestone Tire &

Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  "If the plan grants such

discretionary authority, then the plan administrator's decision is reviewed for

abuse of discretion."  Waldoch v. Medtronic, Inc., 757 F.3d 822, 829 (8th Cir. 2014)

(citation omitted).

In this case, the Policy gives Standard "full and exclusive authority to

control and manage the Group Policy, to administer claims, and to interpret the

Group Policy and resolve all questions arising in the administration,

interpretation, and application of the Group Policy" including "[t]he right to

resolve all matters when a review has been requested" and "[t]he right to

determine . . . [] [e]ntitlement to benefits." (STND 37.) Because this Policy

language gives the third-party administrator, Standard, discretionary authority

to determine entitlement to benefits, as the parties agree, the abuse of discretion

standard applies.

"Under the abuse of discretion standard, the court must affirm the plan

administrator's interpretation of the plan unless it is arbitrary and capricious."

Manning v. Am. Republic Ins. Co., 604 F.3d 1030, 1038 (8th Cir. 2010).

> To determine whether a plan administrator's decision was arbitrary
> and capricious, the court examines whether the decision was
> reasonable. Any reasonable decision will stand, even if the court
> would interpret the language differently as an original matter.

Id. (citations omitted). Under this standard, the Court "must affirm if a

reasonable person could have reached a similar decision, given the evidence

before him, not that a reasonable person would have reached that decision."

Prezioso v. Prudential Ins. Co. of Am., 748 F.3d 797, 805 (8th Cir. 2014) (citations

omitted).

## 2.    Conflict of Interest

As Whitley correctly notes, because Standard both evaluates claims and is

responsible for paying out those claims, it has a pecuniary interest in denying

claims and an inherent conflict of interest. See Metro. Life Ins. Co. v. Glenn, 554

U.S. 105, 112 (2008).  The Court considers the conflict of interest "as a factor in

determining whether the plan administrator has abused its discretion in denying

benefits." Id. at 108.  All relevant factors, including the presence of a conflict of

interest, should be used as a tiebreaker when the other factors are "closely

balanced." Id. at 117.  A conflict of interest should be given greater importance if

a party can show that "circumstances suggest a higher likelihood that it affected

the benefits decision." Id.  Even if the record contains little evidence of the plan

administrator's history or efforts to ensure the claim assessment is not affected

by the conflict, the Court may still give the conflict some weight.  Darvell v. Life

Ins. Co. of N. Am., 597 F.3d 929, 934 (8th Cir. 2010) (citing Glenn, 554 U.S. at 118).

### 3.   Whether Standard Abused Its Discretion in Determining Whitley's Own Occupation

Whitley contends that Standard's use of the wrong "Own Occupation"

was an abuse of discretion.  Standard retorts that family practitioner is a correct

definition of Whitley's Own Occupation, but that, in any case, during the appeal,

it also analyzed her claim under the theory that her Own Occupation was

emergency room physician and thus did not abuse its discretion.

Under the Policy, an insured is considered disabled if she is "unable to

perform with reasonable continuity the Material Duties of [her] Own

Occupation." (STND 9.)  In Standard's initial decision terminating Whitley's

long-term disability benefits, and on appeal, Standard defined her "Own

Occupation" as family practitioner, and not emergency medicine, because she is

board certified as a Family Practitioner and because, despite multiple attempts, it

had not received billing or CPT code information documentation to support that

at least 60% of her gross income during the 24 months before she became

Disabled came from Emergency Medicine.  (Id. 828.)

       The Court finds that Standard acted arbitrarily in determining that

Whitley's Own Occupation was family medicine physician.  Although the CPT

codes would have been determinative, Standard ignored ample evidence in the

record establishing that Whitley is an emergency room physician and had been

working in that role for many years before becoming disabled.  In her vocational

assessment, Paquette recognized that Whitley had been working "for many years

as an emergency room physician." (Id. 1024.)  The Employer's Statement and the

Employee's Statement both indicated that Whitley worked as an emergency

room physician.  (Id.; see also id. 1037).  Moreover, correspondence between

Whitley and Lake Region demonstrate her previous employment as an

emergency room physician.  (See id. 622, 624.)  On September 10, 2012, Peterson

sent a letter to Standard verifying that "in the 24 month period prior to February,

2011, Whitley provided professional services through her employment with Lake

Region Medical Group, PA solely as an emergency medicine specialist." (Foss

Aff., Ex. A.) Indeed, Standard admittedly knew that she had been working as an

emergency room physician. (STND 912, 827.) Here, the conflict of interest factor

comes into play, because, in choosing an Own Occupation of family practitioner,

Standard selected the occupation that involved less physical and emotional

stress.

Standard claims that, even if its determination of Whitley's "Own

Occupation" was incorrect, it did not affect the coverage determination because

Standard considered the duties of both a family medicine physician and an

emergency room physician in concluding that she was able to return to work.

But according to Standard's vocational assessments, there is a notable difference

between the work of a family practitioner and emergency room physician. The

temperament requirements related to the occupation of emergency room

physician "would be more functionally challenging given the pace and urgency

of ER medicine." (Id. 1029.) Emergency room physicians "may work long shifts,

on-call and the like . . . may have to work at a more intensive pace requiring

physical and mental endurance for handling emergencies . . . .  These duties . . .

can involve greater physical exertion than that generally required of a general

physician.  (Id. 1025.)  Conversely, the work of a family practitioner is considered

"light" work.  (Id. 1039.)  Moreover, there is a reasonable expectation that "the

stress involved in emergency work is going to be greater than found in an office

or clinical setting where family practitioners generally work."  (Id. 1028-29.)

Indeed, common sense counsels that physical and mental demands of the family

practitioner and emergency room physician are quite dissimilar.

Despite this significant difference, Standard's consulting physician reports

contain only unsupported and conclusory assertions regarding Whitley's ability

to generally perform work in an emergency setting that fail to adequately

account for the significant differences between the "light" work of a family

practitioner and the increased mental demands placed on an emergency room

physician compared to a family practitioner in reaching their conclusions.

Therefore, the Court concludes that Standard acted arbitrarily and capriciously,

and thus abused its discretion, in determining Whitley's Own Occupation.

### 4.   Whether Standard Abused Its Discretion In Determining that Whitley Could Return to Work Full-Time

On review of the administrator's decision, the Court must determine whether it is supported by substantial evidence.  <u>King v. Hartford Life and Acc. Ins. Co.</u>, 414 F.3d 994, 999 (8th Cir. 2005) (citation omitted).  "While the administrator's decision need not be supported by a preponderance of the evidence, there must be 'more than a scintilla.'"  <u>House v. Paul Revere Life Ins. Co.</u>, 241 F.3d 1045, 1048 (8th Cir. 2001) (citation omitted).

A plan administrator abuses its discretion when it "focus[es] on slivers of information that <u>could be</u> read to support of denial of coverage and ignore[s]—without explanation—a wealth of evidence that directly contradict[s] its basis for denying coverage."  <u>Wilcox v. Liberty Life Assur. Co. of Boston</u>, 552 F.3d 693, 702 (8th Cir. 2009) (quoting <u>Metro. Life Ins. Co. v. Conger</u>, 474 F.3d 258, 265 (6th Cir. 2007)).  An ERISA plan administrator need not accord special deference to a treating physician's opinion. <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 825 (2003).  However, it abuses its discretion in accepting the opinion of a reviewing physician over the conflicting opinion of a treating physician when the record does not support it or it is "overwhelmed by contrary evidence."  <u>Coker v. Metro. Life Ins. Co.</u>, 281 F.3d 793, 799 (8th Cir. 2002) (citation omitted).  An

administrator may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  <u>Nord</u>, 538 U.S. at 834.

Standard argues that its decision to discontinue disability benefits was sufficiently supported by statements from Whitley, her treating physicians, Standard's consulting physicians and Whitley's medical records.  However, Whitley correctly notes that there was no indication from Whitley or any of her treating medical providers that she was able to return to work full time or for extended hours.  In fact, Whitley's treating physicians overwhelmingly recommended a return on a restricted basis.  They also expressed concerns that Whitley's postconcussion syndrome symptoms became exacerbated when she overexerted herself, and that her performance on cognitive tests was not an accurate predictor of her ability to perform her duties.  In denying benefits, Standard arbitrarily focused on Whitley's statements that she was improving and generally ready to return to work, while simultaneously refusing to credit the fairly uniform recommendation of Whitley's treating physicians that a gradual return was necessary.

The conclusions of Standard's consulting physicians, that Whitley had no cognitive or physical impairments that would prevent her from returning to

work full-time, also emphasize "slivers of information" over overwhelming

contrary evidence.  For instance, Fancher's initial review of the claim file noted

that Whitley suffered from a "particularly severe injury," but relied solely on

Berlgoff's statement that Whitley had "no cognitive impairments in any area" in

concluding she was able to work full time.  (STND 579.)  Likewise, Morgan's

conclusion that Whitley had a "minor concussion at best" and should have been

healed within days or weeks (id. 240-241) is not supported by her treating

physicians or the lengthy treatment she subsequently received.  Similarly,

Williams, in evaluating Whitley's mental endurance, relied on her participation

in day-long neurophysiological testing, her completion of eighty hours of

continuing medical education over a seven month period, and her ability to read

for four to five hours (id. 443)—none of which supports the notion that Whitley

has the mental and physical endurance to perform the duties required of her

position.  Likewise, these consulting physicians totally dismiss, without support,

the recommendation of Whitley's treating physicians that she should return to

work on a part-time basis, with supervision, to determine whether or not she can

perform her job duties.

Moreover, the opinions of Standard's consulting physicians are not uniform.  Dr. Greif noted that "[w]e do not know if the claimant is entirely back to baseline function from before the concussion."  (<u>Id.</u> 530.)  She further acknowledged that, given Whitley's history of concussions and "the nature of high responsibility of a physician in her occupation, working in the emergency room, it would be prudent to have a return-to-work plan that involves monitoring adequacy of her work."  (<u>Id.</u> 530.)  She conceded that "supervision is more of a nonnegotiable issue, given the serious responsibilities the claimant would have as a physician, the less than entirely clear neurophysiological test results, and the presumed seriousness of cognitive inefficiency/deficits that have necessitated a year plus of treatment."  (<u>Id.</u> 530.)

Again, Standard's conflict of interest warrants a finding that Standard acted arbitrarily and capriciously under these circumstances.  Accordingly, the Court concludes that Standard abused its discretion in denying Whitley's benefits.

### 5.      Conclusion

Having found that Standard abused its discretion in determining Whitley's "Own Occupation" and in determining that Whitley could return to work on a full-time, basis, the Court grants Whitley's motion for summary judgment as to

Count I of the Amended Complaint against Standard.  Whitley is entitled to

disability benefits from Standard under the Policy from August 1, 2012, until she

is no longer "disabled" from her "Own Occupation" as an emergency medicine

physician.

### C.      Liability of Lake Region as an ERISA Fiduciary

Lake Region and Standard move for summary judgment against Lake

Region on Count II of the Amended Complaint, a Claim for Breaches of

Fiduciary Duty under 29 U.S.C. § 1132(a)(3)(B).  Whitley argues there are genuine

issues of material fact as to whether Lake Region acted as a fiduciary and

breached its duties as a fiduciary by failing to provide CPT codes and by

providing false information to Whitley regarding her coverage under the Policy.

The Court finds evidence in the record that Lake Region falsely

represented to Whitley that, as one of her employment benefits, she would

receive "own occupation" disability insurance coverage that defined her "own

occupation" as emergency room physician.  There is also evidence that Lake

Region was, at a minimum, negligent in responding to Standard's simple request

for CPT codes.  For example, Lake Region sent a letter to Standard stating that

the CPT codes were enclosed when, in fact, they were not.

However, Whitley has chosen to only assert an ERISA breach of fiduciary duty claim against Lake Region.  Thus, to succeed, Whitley must be able to show that Lake Region was a fiduciary under ERISA.  See Kyle Rys., Inc. v. Pac. Admin. Servs., Inc., 990 F.2d 513, 516 (9th Cir. 1993) ("ERISA permits suits for breach of fiduciary duty only against ERISA defined fiduciaries.") (citations omitted).

Under ERISA,

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  "[P]ersons who have no power to make any decisions as to plan policy, interpretations, practices or procedures" but who perform various administrative functions for an employee benefit plan, including "[m]aintenance of participants' service and employment records" and "[o]rientation of new participants and advising participants of their rights and options under the plan," are not fiduciaries with respect to the plan.  29 C.F.R. § 2509.75-8, D-2. Third parties are not fiduciaries when they just perform ministerial duties or process claims.  Kyle Rys., Inc., 990 F.2d at 516.

There is no evidence in the record that Lake Region was acting as a fiduciary or plan administrator with respect to Whitley's claim. The Policy states that the payment of long term disability claims is solely within the discretion of Standard. (STND 37.) When Whitley made her claim for long term disability payments, she submitted the claim directly to Standard, without any assistance from Lake Region. (Whitley Dep. 62-63.) There is no evidence that Lake Region was involved in the decision to approve benefits for Whitley under the Policy, nor is there evidence that it was involved in the decision to later discontinue benefits. Whitley testified that she understood that Standard was the entity that approved or denied her claim. (Id. 65.) There is also no evidence that Lake Region had discretionary authority or control over the Plan or over Plan assets or that it had any discretionary responsibility in administering the Plan. While Standard did provide information about Whitley's benefits to her, and took on administrative functions in forwarding the CPT codes, those acts, alone, do not constitute the type of duty that would make it a fiduciary under ERISA. See 29 C.F.R. § 2509.75-8, D-2.

Whitley cites to several cases for the proposition that, depending on their actions, employers can be ERISA fiduciaries. See Varity Corp. v. Howe, 516 U.S.

489, 502 (1996); Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 645-

46 (8th Cir. 2007); Hickman v. Tosco Corp., 840 F.2d 564, 566 (8th Cir. 1988).

However, in the cases upon which Whitley relies, the employer was also the plan

administrator.  In Varity, the defendant was both the employer and the plan

administrator, and the Supreme Court held that the defendant was wearing both

the employer hat and the administrator hat when it made representations

regarding the benefits and coverage of the plan.  Id. at 498, 503.  Similarly, in

Kalda, the employer was also the plan administrator.  481 F.3d at 642.  The

Eighth Circuit noted that the employer played a dual role and needed to "wear

the fiduciary hat when making fiduciary decisions."  Id. at 645 (citation omitted).

In Hickman, the employer was "a fiduciary within the meaning of ERISA, and

thus subject to the fiduciary standard of care, because it appoints and removes

the members of the administrative committee that administers the pension plan."

840 F.2d at 566.  Because this case involves a third-party administrator, Standard,

Lake Region does not play the dual role of employer and administrator, and

these cases do not apply.

   While the Court is compelled to dismiss Whitley's ERISA breach of

fiduciary duty claims against Lake Region based on her choice of legal theory, its

42

decision should not be seen in any way as condoning Lake Region's conduct in this matter.  To the contrary, the Court believes Lake Region acted in a manner wholly inconsistent with principles of professionalism and common courtesy in misrepresenting to Whitley the nature of her disability benefits, and in failing to respond to Standard's request for information. While Whitley's claim cannot be sustained, this is not the type of behavior that should be encouraged, or sanctioned, by the courts.

Accordingly, based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1.  Defendant Standard Insurance Company's Motion for Summary Judgment [Docket No. 30] is **DENIED**.

2.  Plaintiff Gwendolyn Whitley's Motion for Summary Judgment [Docket No. 47] is **GRANTED**.

3.  Defendant Standard Insurance Company abused its discretion in terminating Plaintiff Gwendolyn Whitley's long-term disability benefits by (a) arbitrarily and capriciously evaluating Plaintiff Whitley's claim under the "Own Occupation" of a family medicine physician rather than an emergency room physician; and (b) arbitrarily determining that Plaintiff Whitley was able to return to work on a full-time basis.

4.  Plaintiff Gwendolyn Whitley is entitled to disability benefits from Defendant Standard Insurance Company under long-term disability insurance Group Policy No. 642850 from August 1, 2012, to the present, and ongoing disability benefits from Defendant Standard

Insurance Company under long-term disability insurance Group Policy No. 642850 until such time as she is no longer "disabled" from her "Own Occupation" as an emergency medicine physician.

5.      Defendant Lake Region Medical Group, P.A.'s Motion for Summary Judgment [Docket No. 42] is **GRANTED**.

6.      Count II of the Amended Complaint against Defendant Lake Region Medical Group, P.A. is **DISMISSED WITH PREJUDICE**.

LET JUDGMENT BE ENTERED ACCORDINGLY


Dated:  February 4, 2015                    s/ Michael J. Davis
                                            Michael J. Davis
                                            Chief Judge
                                            United States District Court